IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

INTRANSIT, INC., dba UTI
TRANSPORT SOLUTIONS, INC.
an Oregon Corporation,

Case No. 1:11-CV-03146-CL

**ORDER**

Plaintiff,

v.

TRAVELERS PROPERTY AND
CASUALTY COMPANY OF AMERICA,

Defendant.

_____

CLARKE, Magistrate Judge.

This case involves whether an insurer's liability policy covering loss of property during transit, covers theft by a fraudulent or imposter carrier. Plaintiff Intransit, Inc., dba UTI Transport Solutions, Inc. brought this action to recover its policy limit of $300,000 under a liability insurance policy issued by defendant Travelers Property and Casualty Company of America. Both parties moved for summary judgment. For the reasons stated below, the court after careful scrutiny finds that the policy is ambiguous as to whether theft by fraudulent or imposter carriers is covered and thus construes the policy in plaintiff's favor. Accordingly, plaintiff's motion (#23) is GRANTED, and defendant's motion (#20) is DENIED.

## PROCEDURAL HISTORY

Plaintiff originally filed this action on October 31, 2011, in the Jackson County Circuit Court. Intransit Inc.v, dba UTi Transp. Solutions v. Travelers Prop. & Cas. Co. of Am., Case No. 115398D9. On December 6, 2011, defendant removed the case to federal court, alleging jurisdiction based on diversity of citizenship under 28 USC § 1332. The parties executed written consents to entry of judgment by a magistrate judge (#9).

## BACKGROUND

The material facts are not in dispute. Plaintiff is a transportation brokerage company incorporated under the laws of Oregon with its principal place of business in Medford, Oregon. Compl., ¶ 1. Defendant is an insurance company incorporated under the laws of Connecticut with its principal place of business in Connecticut. Notice of Removal, ¶ 5. In October 2010, defendant sold plaintiff inland marine insurance, providing up to $300,000 in coverage for property being transported from one location to another. Decl. of Lloyd Bernstein, Ex. A, pp. 4-12. The policy covered loss of the "property of others...[f]or which [the insured] arranged transportation with a 'carrier' of the type described in the Declarations..." Id., pp. 6. The declarations defined "carrier" as any railroad company, motor transportation company, or air freight company. Id., pp. 9. The policy also contained an exclusion and an endorsement relevant to this case. The exclusion barred any coverage for losses resulting from "dishonest or criminal acts" by the insured's employees, carriers, and others with "interest in, or entrusted with, the property." Id., pp. 11. The endorsement, however, provided limited coverage up to $50,000 for property losses resulting from dishonest acts by a carrier. Id.

On January 21, 2011, plaintiff agreed to broker a load of LCD monitors from the City of Industry, California, to Dinuba, California. Compl., ¶ 5. Following its standard routine

regarding brokerage agreements, plaintiff posted the shipment details on various load-posting websites to find a carrier to transport the load. Gabrielle Ervin Depo. Trans., pp. 11-12. In the morning on January 31, 2011, a person representing himself as an employee of C&A Transportation Services, LLC ("C&A") responded to the posting. Ervin Aff., ¶ 7.[1] The supposed representative of C&A provided plaintiff with a Certificate of Liability Insurance from "Lavern Insurance Agency" and signed a carrier-broker agreement. Id., ¶ 9. After speaking with a supposed representative of Lavern Insurance, plaintiff approved C&A to transfer the load. Id., ¶ 10-12.

In the afternoon on January 31, 2011, an individual who represented himself as a driver for C&A picked up the shipment of monitors. Compl., ¶ 7. The load did not arrive in Dinuba, however, and a subsequent criminal investigation revealed that an imposter had posed as a representative of C&A in order to receive authorization to pick up the shipment. Id., ¶ 8-9. Further investigation also revealed Lavern Insurance Agency was not a legitimate company, and that the Certificate of Liability Insurance submitted by the C&A imposter had been falsified. Pedro Martin Depo. Trans., pp 9-10; Nanette Minucci Depo. Trans., pp. 6-8.

In February 2011, plaintiff filed a proof of loss with defendant for $310,172, the estimated value of the stolen monitors. Marco Boccato Aff., Ex. 14, pp. 2. Defendant took the position that the fraudulent or imposter carrier was still a "carrier" under the policy and paid the $50,000 limits for dishonest acts by a carrier. Id. Plaintiff disputed defendant's coverage determination, arguing that the policy fully covered theft by fraudulent or imposter carriers and that it should be awarded $300,000 under the general coverage grant. Plaintiff's Memo, Ex. 15, pp. 1. In July 2011, defendant issued a letter in response, stating that under the terms of the policy, the imposter was a "carrier" and "entrusted with" the property, thus excluding the loss

---

[1] C&A is a legitimate motor transportation company based in San Diego. Pedro Martin Depo. Trans., pp. 7.

from general coverage. Boccato Aff., Ex. 15, pp. 1-2. In October 2011, Plaintiff filed the

present lawsuit, seeking $300,000, plus interest, fees, and costs. Compl., ¶ 15.

## SUMMARY

The ultimate issue before the court is whether the parties intended the insurance policy to

cover theft by a fraudulent or imposter carrier? Based on the language and context of the policy,

the court simply cannot tell. The court finds ambiguity in both the coverage grant and the

exclusions sections of the policy that it construes against defendant and in favor of plaintiff.

## APPLICABLE INSURANCE POLICY PROVISIONS

### I.    Coverage grant.

The policy in the coverage grant provides as follows:

COVERAGE
We cover "loss" to Covered Property from any of the Covered Causes of "Loss."
1.  Covered Property, as used in this Coverage Form, means property of others:
    (a)  For which you have arranged transportation with a "carrier" of the type
         described in the Declarations; and
    (b)  That you have agreed to insure.
         We cover such property while in the due course of transportation.
         ....

DEFINITIONS
1.  "Carrier" means any
    a.  Railroad company;
    b.  Motor transportation company; or
    c.  Air freight company.

### II.   Exclusions.

The policy in the exclusion section provides as follows:

We will not pay for "loss" caused by or resulting from any of the following:
a.  Delay, loss of use, loss of market, loss of income, interruption of business or
    any other consequential loss.
b.  Dishonest or criminal acts by any of the following whether or not acting alone
    or in collusion with other persons or occurring during the hours of
    employment:
    (1)  You, your employees or authorized representatives;

(2)   The "carrier" or its employees or authorized representatives; or
(3)   Anyone else with an interest in, or entrusted with, the property.
But this exclusion does not apply to coverage provided by the "carrier"
Dishonesty Additional Coverage.

## III.   Endorsement.

The endorsement in the exclusion section provides as follows:

"Carrier" Dishonesty
We will pay up to $50,000 in any one occurrence for loss of or damage to
Covered Property caused by or resulting from any fraudulent, dishonest, or
criminal act committed by a "carrier." But this Additional Coverage does not
apply to any fraudulent, dishonest, or criminal act committed by you.

## LEGAL STANDARD

Summary judgment is proper when there is no genuine issue as to any material fact and

the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The court cannot weigh the evidence or

determine the truth but may only determine whether there is a genuine issue of fact. Playboy

Enters., Inc. v. Welles, 279 F.3d 796, 800 (9th Cir. 2002). Material facts are those that might

affect the outcome of the case. Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248 (1986). A

dispute over a material fact is "genuine" if there is sufficient evidence for a reasonable jury to

return a verdict for the nonmoving party. Id.

## ANALYTICAL FRAMEWORK

This case turns on the interpretation of terms in an insurance policy. The interpretation of

an insurance policy is a question of law and not of fact. Hoffman Constr. Co. of Alaska v. Fred

S. James & Co., of Or., 313 Or. 464, 469 (1991). Only the four corners of the policy may be

used when examining a policy; extrinsic evidence is not admissible as an aid to interpretation.

Ortiz v. State Farm Fire & Cas. Co., 244 Or. App 355, 360 (2011). When interpreting insurance

contracts, "[t]he primary and governing rule" is to "ascertain the intention of the parties."

Hoffman, 313 Or. 464 at 469 (quoting Totten v. New York Life Ins. Co., 298 Or. 765, 770

(1985)). To obtain the intent of the parties, the court first looks to the terms and conditions of

the policy. Id. If a particular critical term is not defined in the contract and could be construed

in different ways, the court follows a series of steps to give the term meaning. Id. If the term's

meaning is still ambiguous after these steps, then the term is construed against the drafter and in

the insured's favor. Id. at 470-471.

The first step a court follows to define an unclear term is to identify the term's "plain

meaning." Id. A dictionary definition may be used to help determine the plain meaning of a

term. Id. If the term has a plain meaning, then that meaning is applied and no further analysis is

done. Ortiz, 244 Or. App. 355 at 360. If the term is still susceptible to more than one plausible

interpretation after this step, however, the court turns to the second step: analyzing the particular

context in which the term is used in the policy and the broader context of the policy as a whole.

Hoffman, 313 Or. 464 at 470. At this step, the court considers "if and how far one clause is

modified, limited, or controlled by others." Id. (quoting Denton v. Int'l Health & Life, 270 Or.

444, 450 (1974)). Only if multiple plausible interpretations of the term remain after this second

step should the term be construed in the insured's favor. Id. As the court stated in Hoffman,

"when two or more competing, plausible interpretations prove to be reasonable after all other

methods for resolving the dispute over the meaning of particular words fail, *then* the rule of

interpretation against the drafter of the language becomes applicable, because the ambiguity

cannot be permitted to survive." Id. at 470-471.

## PARTIES' ARGUMENTS

In their motions for summary judgment, plaintiff and defendant offer competing

interpretations of two terms in the insurance policy: "carrier" and "entrustment." Defendant

argues that the term "carrier" means "legitimate carrier," and thus the coverage grant only covers property loss when the carrier transporting the load is legitimate. Defendant contends that because plaintiff's loss was the result of a transportation arrangement with a fraudulent or imposter carrier, plaintiff cannot recover anything under the policy's general coverage grant. In response, plaintiff contends it "arranged transportation with a carrier" or at a minimum the meaning of "carrier" is ambiguous, and thus should be construed in plaintiff's favor to include "fraudulent *or* legitimate carrier" and cover plaintiff's loss up to $300,000.

Defendant argues that even if "carrier" is defined in plaintiff's favor, the exclusion prohibiting coverage for anyone "with an interest in, or entrusted with, the property" bars any recovery by plaintiff. Defendant argues that property is "entrusted" when property is handed over to another. Because plaintiff handed over the monitor load to a fraudulent or imposter carrier, defendant contends that the fraudulent or imposter carrier was "entrusted" with the property, excluding any coverage for plaintiff's loss. Plaintiff responds that the term "entrust" requires that the person receiving the property be the person in whom the owner of the property intended to repose confidence. Because it handed over property to a fraudulent or imposter carrier, plaintiff argues that it never "entrusted" the property, and the exclusion section does not apply. As further support for its definition, plaintiff points to cases from other jurisdictions analyzing similar "entrustment exclusions" where imposters acquired property. Though noting that the interpretation of an entrustment exclusion with an imposter is an issue of first impression for Oregon, plaintiff urges the court to follow other jurisdictions' findings that insurers intending to exclude coverage for theft by fraud, imposters, or trickery have a duty to state so explicitly.

Defendant makes the alternative argument that if plaintiff is entitled to any recovery, it is the $50,000 under the "carrier" dishonest acts endorsement that defendant already tendered.

Defendant states that if "carrier" is defined as "legitimate or fraudulent carrier" in the coverage

grant, "carrier" should be defined similarly in the endorsement. Because the endorsement limits

recovery to $50,000 for a fraudulent act committed by a carrier, and defendant tendered this

amount to plaintiff in July, defendant argues that its obligations to plaintiff are satisfied.

Plaintiff responds that because "carrier" is ambiguous, "carrier" should be construed in

plaintiff's favor throughout the policy – even if the result is that the same term is given different

meanings in different parts of the policy. Plaintiff contends that "carrier" means "fraudulent or

legitimate carrier" in the coverage grant, but that "carrier" means "legitimate carrier" in the

exclusion and endorsement. As a result, plaintiff argues, the endorsement does not apply, and

plaintiff should recover the full $300,000 in general coverage.

## DISCUSSION

### I.    Coverage Grant.

The court turns first to the question of whether plaintiff's loss is covered by the policy's

general coverage grant. The coverage grant insures against loss to the property of others "for

which [the insured has] arranged transportation with a 'carrier' of the type described in the

Declarations." Bernstein Decl., Ex. A, pp. 6. The declarations define "carrier" as any "(a)

Railroad company; (b) Motor transportation company; or (c) Air freight company." The policy

does not further define "motor transportation company" and does not provide guidance on

whether the definition of "carrier" includes fraudulent or imposter carriers, or is limited to

legitimate carriers. Id., pp. 9. Another way to phrase the issue is does the "carrier" have to be

licensed or authorized? As will be discussed further below, defendant itself has taken

inconsistent positions on the meaning of the term.

When a term is not defined in an insurance policy, the court follows the procedure set out above to give the term meaning. First, the court examines the plain meaning of the term. Hoffman, 313 Or. 464 at 469. If the term does not have a plain meaning, the court analyzes the term in relationship to the policy as a whole. Id. If more than one plausible interpretation of the term remains after these two steps, then the term is considered ambiguous and is construed in favor of the insured. Id.

Because defining "carrier" as any railroad company, motor transportation company, or air freight company provides no guidance on whether these companies must be legitimate, the court looks to the plain meaning of "carrier." "Carrier," as used here, is "an individual, partnership, corporation, or any organization engaged in transporting passengers or goods for hire by land, water, or air." Webster's Third New Int'l Dictionary, 243 (unabridged ed. 1986). This definition also does not provide clarification on whether "carrier" refers only to legitimate individuals, partnerships, corporations, and other organizations engaged in transportation, or whether the term also includes fraudulent or imposter individuals, partnerships, corporations, and other organizations engaged in transportation. After examining the dictionary definition of the term, the court determines that "carrier" is susceptible to both plaintiff's and defendant's interpretations.

The court looks next to the context of the policy as a tool to narrow down the interpretation of "carrier." In this case, analyzing the policy as a whole provides little guidance. Indeed, defendant's own use of the term demonstrates that "carrier" has multiple reasonable interpretations. In defendant's July 15, 2011, letter to plaintiff explaining its decision to only cover plaintiff's loss under the carrier dishonesty endorsement, defendant states "[t]he fact that the shipment was stolen by an Imposter/thief motor carrier does not, under the Policy's

definition, make it any less a 'carrier.' The Imposter was a motor carrier, albeit an illegal or criminal one." Pl. Mot. Summ. J., Ex. 15, pp. 1. In defendant's June 29, 2012 memorandum in support of its motion for summary judgment, however, defendant states, "the person/entity who obtained possession of the shipment of LCD monitors was an imposter, not a motor transportation company. Therefore, the person/entity that stole the load could not be considered a 'carrier' under the Policy's definition of the term." Def. Mot. Summ. J., pp. 5. Defendant's varying definitions of "carrier" demonstrate that it is unclear whether "carrier" refers to fraudulent or imposter carriers.[2]

Plaintiff argues that the intent of the parties was that the policy is intended to cover theft as long as it is not committed by UTI or its agents, a legitimate carrier or its agents, or a third party that UTI "entrusted" property which did not occur in this case. Plaintiff says it "arranged transportation with a carrier" as provided in the coverage grant even though it turned out to be a fraudulent or imposter carrier. Defendant argues why should this be any different than the property being stolen in transit by an unknown third party that is clearly covered under the policy.

Because the term "carrier" remains ambiguous after the above analysis, it is interpreted against the drafter and in favor of the insured. Hoffman, 313 Or. 464 at 469. Accordingly, the term "carrier" in the coverage grant is construed in favor of plaintiff to include fraudulent or imposter carriers, including the fraudulent or imposter representative of C&A. Defendant could have easily clarified the coverage grant by defining "carrier" to only include "authorized," "legitimate," or "licensed" carriers. This could have been further clarified in the exclusion

---

[2] Plaintiff argues that because defendant initially stated that the imposter carrier was a "carrier," defendant is barred by estoppel from arguing later that the imposter carrier was not a "carrier" (Pl. Res. to Def. Mot. Summ. J., pp. 3-4). Given the court's method of resolving this case, the court does not reach the issue of estoppel. The court also notes that plaintiff has taken conflicting positions about the meaning of 'carrier," arguing initially that "carrier" should not include imposter carriers (Pl. Mot. Summ. J., pp. 16-17), and later arguing that "carrier" should include imposter carriers (Pl. Res. to Def. Mot. Summ J., pp. 9).

section of the policy as discussed below. Interpreting ambiguities against defendant, the court

finds that plaintiff's loss is fully covered under the policy's coverage grant.

## II.    Exclusion and Endorsement.

Having found that the coverage grant applies to plaintiff's loss, the court turns next to the

question of whether recovery for plaintiff's loss is barred by the policy's exclusions section, and

if so, whether the carrier dishonesty endorsement applies and provides limited coverage.

Exclusions (b)(2) and (b)(3) provide:

> "We will not pay for 'loss' caused by or resulting from any of the following...

> b.   Dishonest or Criminal acts by any of the following whether or not acting alone or in
>      collusion with other persons or occurring during working hours of employment:
>
>      (1) You, your employees or authorized representatives;
>      (2) The "carrier" or its employees or authorized representatives; or
>      (3) Anyone else with interest in, or entrusted with, the property."

The end of the exclusion states, "[b]ut this exclusion does not apply to coverage provided by the

'Carrier' Dishonesty Additional Coverage." The carrier dishonesty endorsement states that

defendant will pay up to $50,000 for any one loss resulting from a "fraudulent, dishonest, or

criminal act" committed by a carrier.

### A.    Exclusion (b)(2) and Endorsement.

Exclusion (b)(2) prohibits coverage for dishonest or criminal acts by a carrier or a

carrier's employees or representatives. The endorsement provides limited coverage of $50,000

for dishonesty by a carrier. As stated above, the policy does not provide a definition of "carrier"

beyond being a railroad company, motor transportation company, or air transit company, and

following the steps to interpret the term does not provide assistance. Because the policy is

ambiguous as to whether "carrier" refers to only legitimate carriers or also includes fraudulent or

imposter carriers, the court interprets the term in favor of the insured. In the exclusion and

endorsement, interpreting "carrier" in plaintiff's favor means that the term is defined narrowly to mean "legitimate carrier."

Defendant contends that if "carrier" is defined in the coverage grant to include fraudulent carriers, the same broad definition of "carrier" should be used in the exclusions and in the endorsement. As a result, defendant argues, the carrier dishonesty additional coverage endorsement would apply to plaintiff's loss, and plaintiff's recovery would be limited to the $50,000 previously tendered by defendant. As explained above, however, the policy's definition of "carrier" is ambiguous, and thus must be construed against defendant and in favor of plaintiff throughout the policy. Hoffman, 313 Or. 464 at 469. Interpreting the term in plaintiff's favor, "carrier" as used in Exclusion (b)(2) and the endorsement, means "legitimate carrier" and does not include fraudulent carriers. Consequently, neither Exclusion (b)(2) or the endorsement apply to plaintiff's loss.

## B.    Exclusion (b)(3).

Exclusion (b)(3) prohibits coverage for anyone with an interest in or "entrusted" with the property being transported. "Entrust" is not defined in the insurance policy. As explained above, the court gives undefined terms meaning by looking first for the plain meaning of the term. If the term does not have a plain meaning, it is analyzed in relationship to the policy as a whole. If the term has multiple plausible interpretations after resort to these two steps, then it is construed against the drafter.

Defendant argues that the plain meaning of "entrust" is clearly set out in Truck Insurance Exchange v. Bill Olinger Mercury, 262 Or. 8 (1972). Defendant contends that under the plain meaning of "entrust" in Truck Ins., property is entrusted whenever responsibility for the property

is handed over to another. Defendant contends that under this definition, plaintiff clearly "entrusted" property, and thus Exclusion (a)(3) bars coverage for plaintiff's loss.

In Truck Ins., the Oregon Supreme Court interpreted an "entrustment exclusion" relating to an insurance policy's coverage of theft, finding that the exclusion applied to the plaintiff's loss. Truck Ins., 262 Or. 8 at 14. In that case, the insured, the owner of a car dealership, gave access to its employees during the day by leaving keys in the cars. Id. at 11. An employee stole cars from the dealership, and the court examined a policy excluding losses arising from theft and other dishonest acts committed by any person "entrusted by the insured with custody or possession" of the cars. Id. at 9. Because the policy did not provide a definition of "entrust," the court adopted the dictionary definition of the term: "to commit or surrender (something) to another with a certain confidence regarding his case, use, or disposal of it." Id. at 15 (*citing* Webster's New Int'l Dictionary 855 (2nd ed. 1961)). The court held that the entrustment exclusion applied to the dealership owner's loss, because the employee's responsibility for the keys and for watching over and handling the dealership owner's merchandise was evidence that the dealer owner had a "certain confidence" in the employee. Id. at 15.

While Truck Ins. provides a starting point for analyzing the term "entrustment," it does not provide an answer as to whether property can be entrusted to a fraud or imposter. The court acknowledges that "entrust" means "to commit or surrender (something) to another with a certain confidence regarding his care, use, or disposal of it," but finds ambiguity as to whether a person can have a "certain confidence" in an imposter. Truck Ins. involved theft by a known employee, while the case before this court involves theft by a fraudulent or imposter third party. Truck Ins. may have clarified that an employer can "entrust" property to an employee who

Page 13 - ORDER

subsequently steals the property, but it does not provided guidance on whether entrustment requires that the person receiving the property is in the fact the person in whom the owner intended to repose confidence. The court finds that the plain meaning of "entrust" does not resolve the issue of whether a person can have a "certain confidence" in an imposter.

Because several plausible interpretations of "entrust" remain after applying the plain meaning found in Truck Ins., the court turns next to an examination of the policy in its entirety. Under plaintiff's definition of "entrust," the Exclusion as a whole bars coverage for theft by any person who receives property and is in fact a person in whom the owner intended to repose confidence: Exclusion (b)(1) bars coverage for theft by employees, Exclusion (b)(2) bars coverage for theft by legitimate carriers, and Exclusion (b)(3) is a catch-all exclusion barring coverage for theft by anyone else who is an intended, legitimate recipient of property. Examining the policy in its entirety using plaintiff's definition of the term, the policy covers dishonest or criminal acts by *unintended* recipients of property, but excludes coverage for dishonest or criminal acts committed by *intended* recipients of property. Plaintiff contends that using this definition is appropriate because the policy then consistently covers all third-party theft. Plaintiff argues that the policy clearly does not exclude from coverage loss resulting from a road-side holdup or theft, so the entrustment exclusion should not bar theft by a fraudulent or imposter carrier. Under its reading, all theft by *unintended* recipients of goods is covered under the policy, whether the unintended recipient is a roadside thief, or a fraudulent carrier.

Looking at the policy as a whole using defendant's definition of "entrust," the policy excludes coverage for dishonest or criminal acts committed by employees or anyone else that is given property, regardless of whether the person receiving property was the intended recipient. Under defendant's definition, Exclusion (b)(3) was intended to bar coverage for cases where the

person with possession of goods was a fraud. Defendant argues that its definition is appropriate because it puts the risk of misplaced trust on the insured. Defendant argues that the insured is in the best position to evaluate carriers and determine who it will entrust with property, and that the entrustment exclusion was written to encourage the insured to have a very thorough process to ensure carrier legitimacy.

The court finds that both of these interpretations are plausible and that an examination of the policy as a whole does not clarify the meaning of "entrust." The policy could have intended consistent coverage for all third-party theft, or it could have included the entrustment endorsement to put the risk of misplaced trust on the insured. Because both definitions are reasonable, the court finds the term ambiguous. Accordingly, the court interprets "entrust" in favor of plaintiff, finding that property may not be entrusted to a thief and that plaintiff's coverage is not limited by Exclusion (b)(3).

The court's finding that Exclusion (b)(3) is ambiguous and thus should be construed in favor of plaintiff is bolstered by the fact that defendant could have avoided ambiguity by drafting the policy to specifically exclude coverage for "theft by fraud, false pretense or trickery by imposters." Though the interpretation of an entrustment exclusion with an imposter is an issue of first impression for Oregon, other courts have examined exclusions similar to the one at issue in this case and have held that insurers have a responsibility to clarify whether loss resulting from fraud is excluded from a policy. These cases are not binding on this court, but their reasoning is persuasive and worth noting.

In Security Ins. Co. of Hartford v. Investors Diversified Ltd., Inc., 407 So.2d 314 (Fla. Dist. Ct. App. 1981), the court examined an entrustment exclusion and held that there was coverage when the insured dealt with an imposter under the mistaken belief that he was someone

else. Id. In that case, a forklift dealer received a call from a supposed customer to test drive a forklift. Id. at 315. The person who then picked up the forklift did not return it, and a subsequent investigation revealed that the phone conversation had been with a fraud. Id. Examining the dealer's insurance policy's clause excluding loss from misappropriation or dishonest acts by anyone in whom the property was entrusted, the court determined that the loss did not apply because the dealer did intend to entrust the property to an imposter. Id. The court further noted that defendant could have explicitly excluded loss resulting from fraud in its endorsement, but chose instead to employ ambiguous language. Id.

Plaintiff also cites to Oscar Freedman v. Queen Ins. Co. of America, 56 Cal.2d 454 (Cal. 1961), where a jeweler received a call from an individual representing himself as a known employee of a retail jeweler, requesting to borrow jewelry for examination. Id. at 456. After the jewelry was handed over, the jeweler discovered that the individual was not an employee of the retail jeweler. Id. The applicable insurance policy excluded theft by a person to whom property was "delivered or entrusted." Id. On the issue of whether property may be entrusted to a fraud, the court noted that "at the very least, one tenable construction is that there can be no valid 'delivery' or 'entrustment' of property to another where the possession of the property is acquired by means of some fraudulent device." Id. at 458. Finding ambiguity in the definition of "entrustment," the court interpreted the term in favor of the insured. Id. As in Security Ins., the court found the insurer's failure to explicitly include loss resulting from fraud significant: "Concededly insurance policies may be so written as to exclude from coverage a loss occurring by reason of a fraudulent scheme, trick, device, or false pretense ...But in the absence of such express language as an exception to coverage, the exclusion may not be grafted into the parties' contract...." Id.

In this case, the court finds that the definition of "entrust" is ambiguous, and thus should be construed in favor of plaintiff. Though not binding, the court finds the reasoning in <u>Security Ins.</u> and <u>Freedman</u> persuasive that insurers have a responsibility to make exclusions clear and explicit. The court finds that property may not be entrusted to an imposter, and that the entrustment exclusion does not apply to plaintiff's loss.

## CONCLUSION

Interpreting all ambiguities in the insurance policy in favor of plaintiff, the court finds that plaintiff's loss is fully covered under the policy and is not limited by any exclusion or endorsement. Accordingly, plaintiff's motion for summary judgment is GRANTED, and defendant's motion for summary judgment is DENIED.

IT IS SO ORDERED.

DATED this _____ day of October, 2012

_____

MARK D. CLARKE

United States Magistrate Judge